No. 66,595

JEREMY HONEYCUTT, a Minor, by and through his guardian, DANIEL H. PHILLIPS, *Appellant,* v. CITY OF WICHITA, *Defendant,* and WICHITA PUBLIC SCHOOL SYSTEM, U.S.D. No. 259, *Appellee.*

(836 P.2d 1128)

Opinion filed July 10, 1992.

*Bradley J. Prochaska,* of Prochaska & Associates, of Wichita, argued the cause, and *Gerard C. Scott,* of the same firm, was with him on the brief for appellant.

*Debra J. Arnett,* of Hartley, Nicholson & Hartley, P.A., of Paola, argued the cause, and *Timothy J. Finnerty,* of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, was with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a personal injury action brought on behalf of Jeremy Honeycutt, a minor, who lost part of both legs when he was run over by a train as he walked home from kindergarten. The trial court granted summary judgment in favor of the Wichita Public School System, U.S.D. No. 259, and Jeremy appeals.

Two issues are presented on appeal: whether Jeremy filed a timely notice of appeal giving this court jurisdiction and, if so, whether the granting of summary judgment in favor of U.S.D. No. 259 was proper.

Jeremy Honeycutt attended morning kindergarten classes at Irving Elementary School. Railroad tracks ran on a diagonal between Jeremy's home and the school. If he walked to or from school, he had to cross the railroad tracks. Broadway Street runs north and south in front of the school. Sixteenth Street, where the accident happened, runs east from in front of the school and forms a "T" intersection with Broadway. The railroad tracks cross Broadway south of the school at Fifteenth Street and cross Sixteenth Street a little over one-half block east of the school. The track apparently does not have a regularly scheduled train running on it during the day, but a train uses the track at some times during a three-hour period each afternoon.

Jeremy usually was taken to school and picked up by his grandfather, who sometimes walked and sometimes used a vehicle. When his grandfather was not available, Jeremy's mother either provided transportation or arranged to have a friend provide transportation.

It appears Jeremy was walking home, unsupervised by an adult, for the first time on March 5, 1987. He was walking with another student after kindergarten was dismissed.

How the accident occurred is disputed, but how it occurred has no significance to this opinion. While a train was proceeding northeast, Jeremy ran alongside the train and either attempted to touch the train or attempted to pull himself up on a ladder when a following car struck him, causing him to fall under the wheels of the car. As a result, Jeremy lost one leg above the knee and the other below the knee.

On behalf of Jeremy, a negligence suit was filed against Union Pacific Railroad Corporation and Missouri Pacific Railroad Company (Railroads), the City of Wichita (City), and U.S.D. No. 259.

The case previously has been before this court on an interlocutory appeal. The four defendants appealed the trial court's order that Jeremy was incapable of negligence, as a matter of law, because of his age. Jeremy was six years and four months of age at the time of the accident. This court held that "the negligence of a particular child in particular circumstances should be determined by the factfinder in each case, based upon that degree of care exercised by children of the same age, intelligence, capacity, and experience." *Honeycutt v. City of Wichita*, 247 Kan. 250, 264, 796 P.2d 549 (1990).

On remand, the claims were disposed of against all of the defendants. The manner and timeliness of the disposals have raised a jurisdictional issue.

U.S.D. No. 259 argues that Jeremy's appeal should be dismissed for lack of jurisdiction because Jeremy's first notice of appeal was filed prematurely and because Jeremy's second notice of appeal was filed too late.

The chronological order of events upon which the jurisdictional issue is based is as follows.

A hearing was held to consider summary judgment motions filed by the City and U.S.D. No. 259. On April 12, 1991, the trial court's order granting summary judgment in favor of U.S.D. No. 259 and the City was journalized and filed. This action involved multiple parties, and the summary judgment order disposed of all of the claims against two of the four parties, leaving claims pending against both railroad companies. The trial court did not issue a K.S.A. 1991 Supp. 60-254(b) certificate. Thus, the summary judgments were not final judgments and could not be appealed until final judgments were granted on the remaining claims. *Fredricks v. Foltz*, 221 Kan. 28, 29-31, 557 P.2d 1252 (1976).

On April 24, 1991, Jeremy and the Railroads reached an oral agreement on all of the remaining claims. Part of the settlement agreement was that the parties would proceed with the Railroads' motion for summary judgment. This was done because of Jeremy's impression that if the court granted the Railroads' motion for summary judgment, then no comparative fault could be assessed against the Railroads in a later trial of the case. A later trial of this case could occur only if Jeremy won his appeal against the

grant of summary judgment to the City or to U.S.D. No. 259. Although not an issue in this case, the general rule is that parties who are dismissed from a suit are not bound by a judgment in that suit. *In re Estate of Beason,* 248 Kan. 803, Syl. ¶ 4, 811 P.2d 848 (1991).

The Railroads' motion for summary judgment was heard on April 25, 1991, and the trial court orally announced it was granting summary judgment in favor of the Railroads. No journal entry was filed until May 8, 1991.

On May 1, 1991, Jeremy filed a notice of appeal from the April 12, 1991, order granting summary judgment to U.S.D. No. 259. He did not appeal the grant of summary judgment to the City. On May 1, there was not a final judgment against the Railroads because the oral judgment had not been journalized.

On May 3, 1991, the trial court conducted a settlement hearing and approved the settlement between Jeremy and the Railroads. The trial court also granted Jeremy's motion to dismiss the case with prejudice because "all matters at issue" between Jeremy and the Railroads had been settled. Jeremy's attorney, his guardian ad litem, and counsel for the Railroads approved the journal entry that dismissed with prejudice the case against the Railroads. The trial judge also approved the journal entry, which was filed that same day.

On May 8, 1991, a journal entry was filed covering the April 25, 1991, hearing, which had granted summary judgment to the Railroads.

On June 4, 1991, the Court of Appeals issued an order to show cause why the appeal should not be dismissed as interlocutory. Jeremy responded by sending copies of the April 12 order granting summary judgment to U.S.D. No. 259 and the City and the May 3 order dismissing the Railroads. Jeremy also filed a second notice of appeal on June 5, 1991, which Jeremy insisted was filed timely because 30 days had not expired from the trial court order of May 8 dismissing the remaining defendants. The Court of Appeals retained the appeal and allowed the parties to brief the jurisdiction issue in their briefs on the merits. Pursuant to K.S.A. 20-3018(c), the appeal subsequently was transferred to this court.

Jeremy admits his first notice of appeal, filed May 1, 1991, was premature, but argues Supreme Court Rule 2.03 (1991 Kan.

Ct. R. Annot. 6) retroactively validates his appeal. Rule 2.03 provides:

"A notice of appeal filed subsequent to an announcement by the judge of the district court on a judgment to be entered, but prior to the actual entry of judgment as provided in K.S.A. 60-258, shall be effective as notice of appeal under K.S.A. 60-2103, if it identifies the judgment or part thereof from which the appeal is taken with sufficient certainty to inform all parties of the rulings to be reviewed on appeal. Such advance filing shall have the same effect for purposes of the appeal as if the notice of appeal had been filed simultaneously with the actual entry of judgment, provided it complies with K.S.A. 60-2103(b)."

U.S.D. No. 259 contends Rule 2.03 does not save Jeremy's first notice of appeal because Jeremy's appeal was interlocutory and, as such, this court should follow the Court of Appeals' decision in *Miller v. Safeco Ins. Co. of America*, 11 Kan. App. 2d 91, 712 P.2d 1282, *rev. denied* 238 Kan. 878 (1986).

Had the plaintiff not settled his case against the Railroads and dismissed the case with prejudice, the jurisdictional problem would not exist. This is because the trial court orally granted summary judgment to the Railroads on April 25, 1991, and plaintiff filed a notice of appeal on May 1, 1991. A journal entry granting summary judgment to the Railroads, pursuant to the oral judgment of April 25, 1991, was filed on May 8, 1991. That sequence clearly is covered by Supreme Court Rule 2.03 and *Miller v. Safeco*.

In *Miller v. Safeco*, a personal injury action, the trial court granted summary judgment to Safeco, Miller's insurer. Miller then appealed before the trial court had disposed of Miller's other claims against Gober, the alleged tortfeasor. That is the exact situation we have before us. As in the case at bar, the trial court then disposed of the outstanding claims against the remaining defendant, Gober, and that judgment was journalized. Only then did Miller's claims against all parties become a final judgment subject to appeal.

The Court of Appeals held:

"A final judgment from which no appeal was taken does not retroactively validate a premature notice of appeal from an interlocutory order granting summary judgment to one party. To extend Rule 2.03 to these facts would effectively nullify the purpose of K.S.A 60-254(b). Rule 2.03 is limited to those situations where the notice of appeal is filed after the time the decision

is announced, but before a final judgment is entered pursuant to K.S.A. 60-258. The Rule does not save an appeal where the notice of appeal is filed from an interlocutory decision which later becomes part of the final judgment disposing of all issues in the litigation." 11 Kan. App. 2d at 94.

What effect does Jeremy's settlement and the journal entry of judgment dismissing with prejudice the Railroads have in this case? If this court follows *Miller v. Safeco's* interpretation of Supreme Court Rule 2.03, the answer is clear. If the journal entry of judgment, filed on May 3, 1991, dismissing with prejudice the remaining claims is a final judgment disposing of all claims, the period for filing a notice of appeal starts. If so, the notice of appeal filed on June 5, 1991, was filed too late, and this court has no jurisdiction. On the other hand, if the appeal period did not commence until May 8, 1991, with the filing of the journal entry granting summary judgment to the Railroads pursuant to the oral judgment granted on April 25, 1991, then the June 5, 1991, notice of appeal is within 30 days and the appeal is timely.

In *Gulf Ins. Co. v. Bovee*, 217 Kan. 586, 587, 538 P.2d 724 (1975), this court said:

"No definition of 'final decision' is contained in the statute but this court has previously construed it to mean, 'one which finally decides and disposes of the entire merits of the controversy, and reserves no further questions or directions for the future or further action of the court.' *Bates & Son Construction Co. v. Berry*, [217 Kan. 322, 324, 537 P.2d 189]; *Cusintz v. Cusintz*, 195 Kan. 301, 302, 404 P.2d 164. See also, *Connell v. State Highway Commission*, 192 Kan. 371, 388 P.2d 637."

See 6 Vernon's Kansas C. Civ. Proc. § 60-2102, Author's Comments, § 2102.2 (1967) and 2 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-2102, Comments (1979). In Gard, the author commented that a " 'final decision' . . . is really self-defining. Obviously it is an order which definitely terminates a right or liability involved in the action, or which grants or refuses a remedy as a terminal act in the case."

In *Guillian v. Watts*, 249 Kan. 606, 615, 822 P.2d 582 (1991), this court cited with approval *Brooks v. Barbour Energy Corp*, 804 F.2d 1144, 1146 (10th Cir. 1986), for the proposition that the trial court's approval of a settlement of claims, including the amount of damages to be paid, is a judgment on the merits.

Relying upon *Brooks*, we held, "[A] judgment entered based on a settlement agreement is a judgment on the merits."

A voluntary dismissal of a case with prejudice, based on a settlement agreement that is approved by the court and journalized, is a final judgment on the merits. *Harper Plastics v. Amoco Chemicals Corp*, 657 F.2d 939, 943 (7th Cir. 1981). A dismissal with prejudice by stipulation of the parties and approved by the trial court is res judicata and bars a later lawsuit on the same transaction or occurrence.

No sound reason exists why an outstanding court order that has not been journalized should extend the time to appeal once a final judgment disposing of all issues has been journalized and filed.

A journal entry, signed by the trial judge and filed with the clerk of the court, disposed of all issues between Jeremy and U.S.D. No. 259. Pursuant to K.S.A. 60-258, that judgment became effective when filed on April 12, 1991. Jeremy filed a notice of appeal on May 1, 1991, appealing from the judgment entered April 12, 1991, involving U.S.D. No. 259. The issues appealed from on May 1, 1991, are the only issues plaintiff seeks to have reviewed.

Jeremy's notice of appeal, filed on May 1, 1991, was within 30 days of the entry of judgment against him on April 12, 1991, and specified the judgment appealed from and otherwise complied with K.S.A. 1991 Supp. 60-2103(b) (Notice of Appeal). It also is a premature notice of appeal, and the appellate courts of this state consistently have refused, in a long line of cases, to hear piecemeal appeals. Does it follow that a notice of appeal of a judgment disposing of all claims against one of the multiple parties that is otherwise valid is void and incapable of becoming effective when a final judgment is entered because it is filed before claims against other defendants have been finalized?

We have no hesitancy in holding that when the journal entry approving Jeremy's settlement with the Railroads, dismissing the remaining claims with prejudice, and without reserving further questions or giving direction for the future or further action of the court was filed, a final decision was entered as of that date, May 3, 1991, triggering the statute of limitations period. Thus,

the notice of appeal filed on June 5, 1991, came too late and does not give this court jurisdiction.

Prior to the adoption of the 1964 Code of Civil Procedure, pleadings were technical and the failure to strictly follow rules generally was fatal. The new code attempted to bring a relaxed atmosphere to the legal practice. Notice pleading was adopted and substantial compliance, so long as the opposing side was not prejudiced, became the general rule. The theory was that, within reason, the litigants are to have their case decided in court on the merits and that judges should not be hypertechnical in interpreting statutes and rules to defeat the parties having their day in court. Jurisdictional statutes and rules, of course, must be followed; however, there are exceptions even in jurisdictional matters.

K.S.A. 1991 Supp. 60-2101 and K.S.A. 1991 Supp. 60-2102 provide for an appeal from a final judgment, and K.S.A. 1991 Supp. 60-2103 provides that the time within which an appeal may be taken shall be 30 days from the entry of judgment. The trial court may extend the time for appeal, not exceeding 30 days, upon a showing of excusable neglect based on a failure of a party to learn of the entry of judgment. If timely post-trial motions under K.S.A. 1991 Supp. 60-250, K.S.A. 60-252, or K.S.A. 60-259 are filed, the 30-day period to take an appeal commences to run when the entry of an order disposes of the motion. K.S.A. 1991 Supp. 60-2103(a). A notice of appeal must be filed with the clerk of the district court. "Failure of the appellant to take any of the further steps to secure the review of the judgment appealed from does not affect the validity of the appeal . . . ." K.S.A. 1991 Supp. 60-2103(a). Our jurisdictional statutes reflect the legislature's desire to allow litigants their day in court.

The purpose of requiring a final decision prior to an appeal is to prevent intermediate and piecemeal appeals that extend and prolong litigation and add to the cost of litigation. See *Connell v. State Highway Commission*, 192 Kan. 371, 374, 388 P.2d 637 (1964). The trial court has the option of granting a K.S.A. 1991 Supp. 60-254(b) certificate, *i.e.*, "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason

for delay . . . ." Here, the trial judge did not issue a 254(b) certificate.

If the trial judge grants a judgment disposing of all claims against one party but claims remain against other parties and the trial judge does not direct a final judgment, pursuant to K.S.A. 1991 Supp. 60-254(b), the judgment is subject to revision at any time before the entry of judgment adjudicating all of the claims and the rights and liabilities of all the parties.

There are two cases from this court that merit mention. The first case, *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 246 Kan. 371, 789 P.2d 211 (1990), could have tackled *Miller v. Safeco* head-on, but did not. This court instead chose to hold that a motion for attorney fees would be treated as taxing costs. Thus, a notice of appeal filed after a judgment disposing of all claims against all parties, but before the trial court disposed of the motion for attorney fees, was a valid notice of appeal, giving the appellate courts jurisdiction. 246 Kan. at 373-74. The opinion seems to assume that, if the motion for attorney fees was not treated as taxing costs and a final judgment was entered prior to the court acting upon the motion, *Miller v. Safeco* applied and a finding of no jurisdiction would be correct. This court did not mention *Miller v. Safeco* and has never cited it in a published opinion.

In *Snodgrass*, this court also cited the second case that merits discussion. *Snodgrass* cited *Cornett v. Roth*, 233 Kan. 936, 666 P.2d 1182 (1983), for the proposition of liberally construing the procedural statutes.

*Cornett* is of interest because first a journal entry of final judgment was filed. A timely notice for reconsideration of the final judgment then was filed. The appellant subsequently filed a notice of appeal. A motion for reconsideration is considered a motion to alter or amend a judgment. *Heim v. Werth*, 214 Kan. 855, 857, 522 P.2d 389 (1974); *Ten Eyck v. Harp*, 197 Kan. 529, 533, 419 P.2d 922 (1966). Under the federal rules, a motion for reconsideration also qualifies as a motion to alter or amend. *Bestran Corp. v. Eagle Comtronics, Inc.*, 720 F.2d 1019 (9th Cir. 1983). Pursuant to K.S.A. 1991 Supp. 60-2103(a), the running of the time for appeal is terminated by a timely motion to alter or amend, and the appeal time commences to run from the entry

of an order disposing of the motion. In *Cornett,* this court held that jurisdiction was conferred when a notice of appeal was filed before the motion to alter or amend was decided and before an order was entered denying the motion to alter and amend. The court said:

"Defendants have shown no prejudice resulting from the alleged premature filing of the notice of appeal. Considering the liberal construction to be given our procedural statutes and rules and the intent of our code of civil procedure and our appellate rules, we find no fatal jurisdictional defects and will proceed to determine the appeal on the merits." 233 Kan. at 939-40.

*Cornett* is contrary to federal rules construction cases, which hold that a notice of appeal filed before the disposition of a motion to alter and amend has no effect, thus depriving an appellate court of jurisdiction. See, *e.g., F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 739 F.2d 284 (7th Cir. 1984); *Behring Intern., Inc. v. Imperial Iranian Air Force,* 699 F.2d 657, 665, *reh. denied* 712 F.2d 45 (3d Cir. 1983); *Beam v. Youens,* 664 F.2d 1275 (5th Cir. 1982).

The rationale for federal courts holding a premature notice of appeal does not confer jurisdiction largely is based on the problems of simultaneous jurisdiction of the trial court and the appellate court. To allow a premature notice of appeal to ripen into a valid notice of appeal, when all the claims against all the parties are resolved, does cause additional paperwork because the premature notice of appeal is subject to dismissal. A judgment that is not a final judgment in the case and to which a 254(b) certificate has not been granted is subject to change. The simultaneous jurisdiction problem is not that troublesome in Kansas because the trial court keeps jurisdiction until the appeal is docketed in the appellate court.

Allied against the federal rule interpretation and *Miller v. Safeco* is the legislature's and this court's position that the judicial system should offer inexpensive and speedy justice to the citizens of this state and give a liberal construction to the statutes in order to insure that cases are decided on their merits and not to deny a party his or her day in court if the other party to the litigation has not been prejudiced. It eliminates a trap that attorneys and

the ever-increasing number of pro se litigants frequently fall into, costing litigants their day in court on the merits of the case.

The legislature grants jurisdiction and has the authority to require a notice of appeal to be filed after a final judgment in order to confer jurisdiction. If that was the legislature's intent when the Kansas Code of Civil Procedure was drafted, Supreme Court Rule 2.03 is contrary to that intent, for it clearly validates a premature notice of appeal. The legislature has not enacted legislation to cause a different result than that mandated by Rule 2.03.

One could attempt to distinguish *Cornett*, but the bottom line is that it also validates a premature notice of appeal.

Our own Tenth Circuit, sitting en banc, has adopted the philosophy expressed above. In *Lewis v. B. F. Goodrich Co.*, 850 F.2d 641 (10th Cir. 1988), Judge Logan, speaking for the majority, held that a premature notice of appeal will be considered as the situation exists when it is challenged. Thus, if the judgment is final when the premature notice of appeal is challenged on jurisdictional grounds, the premature notice of appeal ripens and saves the appeal. Judge Logan said:

"[W]hen a district court has adjudicated all remaining outstanding claims before this appellate court acts to dismiss the appeal, we will consider the appeal on its merits rather than dismiss for lack of jurisdiction, whether or not a party in the meantime has obtained a Rule 54(b) certification. In such cases generally we will consolidate or companion the earlier appeal with any subsequent appeals arising out of the same district court case." 850 F.2d at 645.

We hold that if a judgment is entered disposing of all claims against one of multiple parties, and a premature notice of appeal is filed and has not been dismissed, then a final judgment disposing of all claims and all parties validates the premature notice of appeal concerning the matters from which the appellant appealed. The appellee will not be prejudiced because the appellee will know of the intent to appeal prior to final judgment and would be in the same position as if a notice of appeal had been filed after the final judgment.

Syllabus ¶¶ 2 and 3 and the corresponding portion of the opinion of *Miller v. Safeco Ins. Co. of America*, 11 Kan. App. 2d 91, 712 P.2d 1282, *rev. denied* 238 Kan. 878 (1986), are overruled.

Jeremy advances two reasons why the trial court erred in granting summary judgment for U.S.D. No. 259: U.S.D. No. 259 owed a duty to Jeremy, and U.S.D. No. 259 was not immune under the Kansas Tort Claims Act.

Jeremy first claims that U.S.D. No. 259 owed him the following duties: (1) to retain him until an authorized adult took custody of him, (2) to retain him on school property through a "hold back" policy in the event of a train operating off school property, and (3) to establish a safety patrol at the railroad crossing. The trial court rejected Jeremy's arguments and granted U.S.D. No. 259's summary judgment motion.

"Summary judgment is proper where the only questions presented are questions of law. [Citation omitted.] To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. [Citation omitted.]" *McGee v. Chalfant*, 248 Kan. 434, 437, 806 P.2d 980 (1991). " 'Whether a duty exists is a question of law. [Citations omitted.] Whether the duty has been breached is a question of fact.' [Citation omitted.]" *Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, 668, 792 P.2d 993 (1990). "It was thus the obligation of the [trial] court in the first instance, and this court on appeal, to determine whether a duty existed. Without a duty, there could be no breach which would support plaintiff's claim." *Hackler v. U.S.D. No. 500*, 245 Kan. 295, 297, 777 P.2d 839 (1989).

Here, the trial court ruled that U.S.D. No. 259 did not owe a duty to Jeremy. Specifically, the trial court made the following findings:

"9. Neither the law nor the uncontroverted facts in this case justify extending a school's duty to supervise a student to activity off school property, after school hours, specifically when a child is going home from school by means other than school-supplied transportation.

"10. Neither the law nor the uncontroverted facts in this case give rise to a duty requiring that a school keep a child from leaving school property, after school hours, until a parent arrives, particularly where as here the parent has not requested that the school detain the child.

"11. Neither the law nor the facts of this case give rise to a duty to implement a hold back policy, if a school utilizes a safety patrol.

"12. Neither the law nor the facts of this case give rise to a duty to place a safety patrol at a railroad crossing."

Jeremy's basis for arguing that U.S.D. No. 259 owed him a duty is two-fold: U.S.D. No. 259 assumed a duty by its conduct and written policies, and the special relationship existing between Jeremy and U.S.D. No. 259 created a duty. Jeremy relies upon the Restatement (Second) of Torts § 324A (1964) to support his argument that U.S.D. No. 259 assumed a duty. Section 324A provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

This court has accepted § 324A's theory of liability and established the following principles:

"The threshold requirement for the application of the Restatement (Second) of Torts § 324A (1964) is a showing that the defendant undertook, gratuitously or for consideration, to render services to another. In order to meet this requirement, the evidence must show the defendant did more than act, but *through affirmative action* assumed an obligation or intended to render services for the benefit of another."

"A duty is owed to third persons by one who undertakes, *by an affirmative act*, to render aid or services to another and then is negligent in the performance of that undertaking." *McGee*, 248 Kan. 434, Syl. ¶¶ 5, 6. (Emphasis added.)

"For a defendant to meet the threshold requirements of § 324A, the defendant must not only take affirmative action to render services to another, but the person to whom the services are directed *must accept such services* in lieu of, or in addition to, such person's obligation to perform the services." *Gooch*, 246 Kan. at 676. (Emphasis added.)

"The extent of the undertaking should define the scope of the duty." *McGee*, 248 Kan. at 442.

"[O]ne who does not assume an obligation to render services does not owe a duty to third persons." *Anderson v. Scheffler*, 248 Kan. 736, Syl. ¶ 3, 811 P.2d 1125 (1991).

In *Gooch*, 246 Kan. at 669-70, this court reviewed recent cases applying § 324A:

"In each of the Kansas cases imposing liability under § 324A, it was clear that [the threshold] requirement was met. In *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982), KCPL agreed to and was hired to render traffic engineering services to the City. In *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 672 P.2d 1083 (1983), the Kansas Turnpike Authority hired Howard-Needles as its consulting engineers to make safety inspections of the turnpike and thus render services to the KTA. In *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984), there was evidence the county agreed with Kansas State Penitentiary officials and other law enforcement agencies to notify these agencies of escapes from the penitentiary. In *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), the police were obligated by a general police department order to take certain incapacitated persons into custody. Further, in the cases not finding a duty, it was clear there was no undertaking. In *Hanna v. Heur, Johns, Neel, Rivers & Webb*, 233 Kan. 206, [662 P.2d 243 (1983),] the court found the defendant architects did not agree to be responsible for safety practices on the jobsite and took no actions indicating they assumed any such responsibility. In *Meyers v. Grubaugh*, 242 Kan. 716, 750 P.2d 1031 (1988), the State simply allowed the intoxicated employee to leave work. Thus, in all cases where it was found that the parties undertook to render services to another, they agreed to or were obligated to perform services for another that were accepted and thus the initial requirement of § 324A was met; and, in all cases where liability was not imposed, the defendants had no agreement and took no affirmative action that could be construed as an intentional undertaking to render services to another."

Jeremy claims the testimony of U.S.D. No. 259 personnel and the school board's documents disclose that U.S.D. No. 259 assumed the following duties:

"[U.S.D. No. 259] assumed a duty to operate, instruct, implement procedures, supervise, and train a safety patrol. It assumed a duty to get the children safely to and from school in an area within an approximate block of the school property. This assumed duty includes a duty to devise a 'hold back' policy. The school assumed a duty to put a safety patrol on the railroad crossing. The school had a duty to call 911, contact the police, or do some other act or take some other action if the safety patrol was being harassed at the railroad crossing. The school assumed a duty to get railroad safety presentations shown at the beginning of the school year. The school assumed a duty to not let the children walk home alone if it knew that the children were always being picked up by an adult. The school had a duty to establish a safety plan to educate the children on what to do when approaching the railroad crossing."

In his brief, Jeremy fails to discuss in any detail the testimony or the documents purportedly supporting his claims or what affirmative acts U.S.D. No. 259 undertook to assume these duties.

In his brief, he also does not cite to the record to support his claims..

For example, Jeremy contends that *his* "statement of facts" proves U.S.D. No. 259 previously retained Jeremy in school until an authorized adult took custody of him and that this shows U.S.D. No. 259 had assumed the duty. At the fall orientation held for kindergartners and their parents, U.S.D. No. 259 made recommendations, but parents were advised that they were responsible for establishing a safe route to and from school for their children. Additionally, a document entitled "From My House to Kindergarten" was distributed. This document stated, "Walk to school with your child before school starts! (Several times is helpful.) Make sure your child knows the safest and shortest route to and from school."

Kindergartners were dismissed at 11:55 a.m. The kindergarten teacher took the children to the front door, and the children then left the school. It was the parents' responsibility to be on time to pick up their children from school.

Depending upon their schedules, Jeremy was picked up at school by either his mother or his grandfather. When Jeremy's grandfather picked him up from school, they walked home half of the time and went by car the other half. Jeremy's grandfather did not always meet Jeremy at the same location: Sometimes he waited on the sidewalk in front of the building, and sometimes he parked his car along the north side of the building. Jeremy's teacher was unable to observe the north side of the building from the front door.

U.S.D. No. 259's Board of Education Policy No. P1360.01 states that school personnel "are neither legally liable nor legally responsible for pupils en route to and from school if the pupils walk or furnish their own transportation." In Jeremy's response to the summary judgment motion, he did not controvert the above statement of fact, but stated that it is an erroneous conclusion. Even if erroneous, the policy statement is relevant because it undermines Jeremy's argument that U.S.D. No. 259 *affirmatively* assumed a duty to protect him on his way to and from school.

Jeremy claims that U.S.D. No. 259's Policy No. P1360.00 admits that teachers are "responsible for the supervision of pupils during the school day and for a reasonable period of time before

and after." Jeremy fails to discuss that policy's "Administrative Implemental Procedures," restricting the area of teacher responsibility to "the building" and "the school site."

U.S.D. No. 259 does not have a policy that prohibits kindergartners from walking home alone. U.S.D. No. 259 maintains that "[t]he implementation of a hold-back policy was within the discretion of the school safety patrol sponsor or the school principal." If parents informed the school, either orally or in writing, that their children would be picked up, the school retained the children until the adult arrived. Neither Jeremy's mother nor his grandfather requested that the school retain Jeremy until one of them arrived. Neither discussed with Jeremy's teacher, prior to the accident, how they wished for Jeremy to be released when kindergarten was over for the day. In fact, Jeremy's mother had never visited with his teacher prior to the accident.

U.S.D. No. 259's Board of Education Policy No. P1307.00E states that "[e]stablishment and operation of school safety patrols are the responsibility of the principal. The operation of a patrol has as its prime purpose the safety of children. A patrol's ultimate goal should be safety education rather than safety enforcement." U.S.D. No. 259 maintains that placing a safety patrol at the railroad tracks was within the school personnel's discretion. The Irving Elementary School's staff handbook stated, "Safety Patrols are stationed at the railroad crossings . . . *as needed.*" (Emphasis added.)

Jeremy contends that U.S.D. No. 259 had a duty to place a safety patrol at the railroad crossing. U.S.D. No. 259 persuasively argues that the documents Jeremy cited give it the authority, not the duty, to place a safety patrol at the railroad crossing.

Jeremy also claims that the prior conduct of Julius McLaurian, Irving Elementary School's previous principal, shows U.S.D. No. 259 assumed the duty of providing safe passage at a railroad crossing for its students. In an affidavit, McLaurian stated that when he was principal from 1980 to 1983, there was a safety patrol at the railroad crossing because it was needed. The trial court found that "even if it can be said that the school's location of the safety patrol at the railroad tracks gave rise to a duty to students, it cannot be said that it gave rise to a duty to [Jeremy].

[Jeremy] was not a student when safety patrols were placed at the tracks."

Jeremy fails to prove U.S.D. No. 259 assumed a duty to him through its conduct or written policies. The record reveals that U.S.D No. 259 did not agree or act affirmatively to protect Jeremy on his way to and from school. Jeremy also fails to prove his mother relied upon or accepted U.S.D. No. 259's alleged assumed duty of protection. In fact, Jeremy's mother testified at a deposition that it was her responsibility to ensure that her son made it safely home after school.

Both parties cite authority from other jurisdictions. Jeremy cites *Jefferson County School Dist. R-1 v. Justus*, 725 P.2d 767 (Colo. 1986), and *Brown v. Florida State Bd. of Regents*, 513 So. 2d 184 (Fla. Dist. App. 1987). In *Justus*, a first-grade student was struck by a car off school premises when he rode his bicycle home from school. The Supreme Court of Colorado stated:

"A plaintiff must first show that the defendant, either through its affirmative acts or through a promise to act, undertook to render a service that was reasonably calculated to prevent the type of harm that befell the plaintiff. . . . Second, a plaintiff must also show either that he relied on the defendant to perform the service or that defendant's undertaking increased plaintiff's risk." 725 P.2d at 771.

The court concluded that

"respondent has raised a genuine issue as to whether by distributing the handbook and by placing teachers at the front of the school, the school district undertook the task of enforcing a rule that students in the lower grades were not eligible to ride bicycles to and from school. Where, as here, a plaintiff presents some evidence of an affirmative act or promise to act sufficient to create an inference that the defendant undertook a service that would have prevented plaintiff's injuries, that factual question precludes summary judgment on the issue of whether the defendant undertook such a service." 725 P.2d at 772.

The case at hand can be distinguished from the *Brown* case, in which the decedent drowned in a lake maintained and controlled by the Board of Regents. For *Brown* and the instant case to be similar, the question in *Brown* would have had to have been whether the Board had assumed a duty to maintain and control the lake.

U.S.D. No. 259 cites cases from New York and California. We believe this line of cases to be more persuasive than the Colorado

case. Upon similar facts, the New York courts have held a school does not have a legal duty to supervise students who are beyond the school's lawful control and custody. See *Pratt v. Robinson*, 39 N.Y.2d 554, 384 N.Y.S.2d 749, 349 N.E.2d 849 (1976); *Palella v. Ulmer*, 136 Misc. 2d 34, 518 N.Y.S.2d 91 (S. Ct. 1987).

"The school's duty is thus coextensive with and concomitant to its physical custody and control over the child. When that custody ceases because the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases [citations omitted]." *Pratt*, 39 N.Y.2d at 560.

To hold otherwise would create an intolerable burden for the school. *Palella*, 136 Misc. 2d at 37.

The California courts also have held that "[a] school district is under no duty to supervise, or provide for the protection of its pupils, on their way home, unless it has undertaken to provide transportation for them." *Kerwin v. County of San Mateo*, 176 Cal. App. 2d 304, 307, 1 Cal. Rptr. 437 (1959); see *Gilbert v. Sacramento Unified School Dist.*, 258 Cal. App. 2d 505, 65 Cal. Rptr. 913 (1968); *Wright v. Arcade School Dist.*, 230 Cal. App. 2d 272, 40 Cal. Rptr. 812 (1964).

The New York and California cases are consistent with the rationale and policy expressed in *Hackler v. U.S.D. No. 500*, 245 Kan. 295, 777 P.2d 839 (1989). In *Hackler*, a nine-year-old student was struck by a vehicle while crossing a busy street after getting off the school bus at his designated stop. The school district provided bus stops on both sides of the road. The parents decided which bus the student would ride and selected the bus route that stopped on the other side of the road. The student sued, alleging the school district owed him the following duties:

"1. To instruct him to cross the street in front of the school bus;

2. to unload him on that side of the street on which he lived;

3. to require him to cross the street in front of the school bus; and

4. to prohibit him from being unloaded at a bus stop on the side of [the road] opposite that on which he lived." 245 Kan. at 297.

This court held the school district did not breach a duty owed to the student, reasoning that

"parents are in the best position to determine which bus their child should ride. This decision may hinge on where the child is to go after school. The

[school district] is not in a position to know where each child is to go after school and the location of those various places." 245 Kan. at 300.

Although no school-supplied transportation was involved in the instant case, the rationale still applies. Parents are in the best position to determine their children's transportation needs to and from school.

Jeremy's second basis for arguing that U.S.D. No. 259 owed a duty is that the special relationship between U.S.D. No. 259 and Jeremy created a duty. In support of this argument, Jeremy relies upon two Kansas cases, *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), and *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984).

In *Fudge*, the police did not detain an intoxicated driver, who subsequently caused an accident that took the life of James Fudge. Pursuant to a general order, the police had a duty to take the intoxicated driver into protective custody. This court held that " 'as a general rule, the duty of law enforcement officers to preserve the peace is a duty owed to the public at large. *Absent some special relationship with or specific duty owed an individual, liability will not lie for damages.* [Citation omitted.]' " *Fudge*, 239 Kan. at 372. The court reasoned:

"The police officers should have realized that taking [the intoxicated driver] into protective custody was necessary for the protection of third persons. Their failure to do so significantly increased the risk that [the intoxicated driver] would cause physical harm to others. Accordingly, the City of Kansas City is subject to liability to James Fudge for the officers' failure to take [the intoxicated driver] into custody." 239 Kan. at 373.

Jeremy argues the instant case is analogous to *Fudge* because

"the school district policies and school staff handbook described safety procedures designed to protect [Jeremy]. Because of the written policies requiring safety patrols, . . . a special relationship existed between the school and the safety patrol that created a duty toward [Jeremy].".

Jeremy's analogy fails. As already discussed, U.S.D. No. 259's written policies, including the school staff handbook, did not *require* safety patrols. The trial court correctly found:

"5. That 'policy' is not a 'specific, mandatory set of guidelines' sufficient to give rise to a duty under *Fudge*, 239 Kan. at Syl. ¶ 3. It is not phrased in the traditional 'mandatory' language such as 'shall' or 'must.' It contains no set of 'detailed mandatory procedures.' 239 Kan. at 372. It clearly leaves

to the judgment of the administrator the determination when safety patrols are 'needed,' while providing no criteria for that determination."

The trial court also noted that "[t]his case differs from *Fudge* in that the major premise is lacking: it cannot be said that the public schools owe a general duty to the public regarding student departures, hold back policies or safety patrols."

Jeremy relies upon *Cansler* to support his argument that "a special relationship existed between [Jeremy] and Irving Elementary School such that [U.S.D. No. 259] has an obligation to exercise control of the safety patrol and teachers for the plaintiff's protection." Jeremy's reliance upon *Cansler* is misplaced.

In *Cansler*, 234 Kan. at 558-59, this court quoted a lengthy passage from Prosser, Law of Torts § 56 (4th ed. 1971), entitled "Controlling Conduct of Others," which mentions that just as a carrier has a duty toward its passengers to take reasonable precautions, including the control of third persons, a school has a similar obligation to its students. Jeremy places too much emphasis on the phrase about schools and students. The focus of the case was whether the State's relationship with inmates created a duty of protection of third persons. This court concluded:

"If the Leavenworth County sheriff's office has agreed with the penitentiary, or with other agencies through the Operation Roadblock plan, that it will warn other law enforcement agencies of escapes, or if it has repeatedly done so, then Leavenworth County may be liable to third persons such as the plaintiff for harm resulting from the failure of its officers to exercise reasonable care in disseminating the information promptly." 234 Kan. at 567.

Here, again, the trial court correctly found:

"There are two problems with [Jeremy's] effort to apply the *Cansler* rationale. First, the record contains no evidence that by initiating the safety patrol or even placing it at the railroad track, the school district rendered services to *another* which it should have recognized as necessary for the protection of students. Second, even if it can be said that the school's location of the safety patrol at the railroad tracks gave rise to a duty to students, it cannot be said that it gave rise to a duty to [Jeremy]. [Jeremy] was not a student when safety patrols were placed at the tracks."

Jeremy also quotes from a California case, *Leger v. Stockton Unified School Dist.*, 202 Cal. App. 3d 1448, 249 Cal. Rptr. 688 (1988). The quote from *Leger* is actually from a previous California case, *Rodriguez v. Inglewood Unified School Dist.*, 186 Cal. App. 3d 707, 230 Cal. Rptr. 823 (1986), *rev. denied* Jan. 22, 1987.

Both cases can be distinguished from the case at hand because the student was injured while on school property. The courts' rationale further illustrates these cases have no application here.

Much of Jeremy's brief is spent on whether U.S.D. No. 259 exercised reasonable care. Whether reasonable care was exercised is a question of fact, precluding the grant of summary judgment. Jeremy cites *Gooch, Cansler,* and *Fudge* for "the proposition that once the principal and safety patrol sponsor take on a responsibility to protect the children on their way to and from school, they must use reasonable care." It does not matter, for our purposes, whether U.S.D. No. 259 exercised reasonable care because Jeremy fails to show U.S.D. No. 259, through its conduct and written policies or because of a special relationship with Jeremy, owed a duty to him. Although the facts of this case are tragic, there must be a duty owed before it can be breached.

Affirmed.