Rosemary SCHMELZLE, Plaintiff,

v.

WAL–MART, INC. and Pepsi–
Cola General Bottlers,
Inc., Defendants.

Civil Action No. 00–2482–CM.

United States District Court,
D. Kansas.

Sept. 23, 2002.

Richard P. Senecal, Atchison, KS, for Plaintiff.

James R. Jarrow, Baker, Sterchi, Cowden & Rice, L.L.C., Overland Park, KS, Mark A. Thornhill, Clayton L. Barker, Spencer, Fane, Britt & Browne, Kansas City, MO, for Defendants.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

This is a personal injury diversity case wherein plaintiff claims that she slipped and fell at defendant Wal–Mart, Inc.'s ("Wal–Mart") Atchison, Kansas store due to the alleged negligence of defendants Wal–Mart and Pepsi–Cola General Bottlers, Inc. ("PCGB"). Pending before the court is defendant Pepsi–Cola Bottlers, Inc.'s Motion for Summary Judgment (Doc. 52). Also pending are Defendant Pepsi–Cola General Bottlers' Motion to

Strike, or in the Alternative, Reply to Plaintiff's "Amended Response" (Doc. 62) and Defendant Pepsi–Cola General Bottlers' Motion to Strike, or in the Alternative, Reply to Defendant Wal–Mart's Memorandum in Opposition (Doc. 63). As set forth below, defendant PCGB's motions to strike are denied and its motion for summary judgment is granted.

### ● Facts[1]

#### A. Plaintiff's Fall

On June 9, 2000, at approximately 3:15 p.m., plaintiff Rosemary Schmelzle slipped on water and fell while she was a customer at defendant Wal–Mart's Atchison, Kansas store. Plaintiff was in the check-out line at the time that she fell. Plaintiff alleges that the water came from one of defendant PCGB's self-serve beverage coolers located near the check-out line.

#### B. Lease Agreement

Defendant PCGB, a cola bottling and distributing company, and defendant Wal–Mart entered into a contractual self service vending agreement. Under this agreement, defendant PCGB

> leased a self-service cooler ("the cooler" or "the Equipment") to defendant Wal–Mart for use at Wal–Mart's Atchison, Kansas store. Pursuant to the agreement, Wal–Mart paid rent for the cooler and retained custody of it at its Atchison, Kansas store. Under the agreement, Wal–Mart further agreed "to use the Equipment properly and keep and return it [to PCGB] in good repair and condition" and "to maintain the Equipment as personal property." Under the agreement, PCGB agreed "to provide routine service and repair to the Equipment."

---

1. According to the applicable summary judgment standard, the facts set forth are either uncontroverted or related in the light most favorable to plaintiff, as the non-moving party. Fed.R.Civ.P. 56.

## C. The Cooler

The cooler leased to defendant Wal–Mart is a typical model, similar to those present in almost every discount or grocery store, and is equipped with a sliding door and stocked with a variety of cold beverages. The leased cooler was designed so that Wal–Mart customers could select a cold beverage from the cooler and pay for the product at the Wal–Mart check-out line. It is unnecessary for a PCGB representative to be present when a transaction involving its product is completed. PCGB employees do not participate in the actual transaction for their product at the Wal–Mart store. PCGB employees are only present at the PCGB cooler to periodically stock the cooler and, when called, to make repairs to the cooler. In the May to June 2000–period, PCGB employees stocked the cooler at the Atchison store three to four times a week.

## D. Defendant Wal–Mart's Procedures

Wal–Mart's employees are trained to constantly be on the "look out" for spills and dangerous situations. Wal–Mart conducts safety sweeps at the Atchison store at 10:00 a.m., 2:00 p.m. and 7:00 p.m.[2] If a spill or water is found on the floor, Wal–Mart employees are required to guard the spill and to summon another employee to bring the necessary supplies to clean up the spill. It is Wal–Mart's standard procedure when a machine is leaking to clean up the spill and then to contact the vendor. In the Atchison store, Julie Reidell, the store's manager for the eighteen months prior to plaintiff's fall, was responsible for calling vendors with complaints about leaks and similar problems. Moreover, Ms. Reidell was responsible for the operations for the entire Atchison store during this time period.

## E. Facts Regarding Plaintiff's Fall

The PCGB cooler purportedly leaked sometime in the week before plaintiff fell (*i.e.*, the week of May 29 to June 2, 2000). Ms. Reidell testified that she called PCGB about a leak from the cooler "the week before the incident happened." Ms. Reidell recalls leaving approximately three messages for PCGB before a PCGB employee came out to fix the leaking cooler. In response to Ms. Reidell's call to PCGB the "week before the incident happened," the PCGB driver assigned to the Atchison store came to the store and worked on the cooler. Ms. Reidell testified that the PCGB driver who worked on the cooler the week before plaintiff fell indicated to her that the cooler "wasn't leaking anymore, that he had fixed the problem." From the time of this service call until June 9, 2000, there were no problems with the cooler and no problems reported to PCGB. Moreover, Ms. Reidell testified that she could not recall any "specific incident" involving leaking coolers before the problem with PCGB's leased cooler arose the week before plaintiff's fall occurred.

Beverly Magee was an assistant manager and the acting store manager at the Atchison store on Friday, June 9, 2000— the day of plaintiff's fall. Ms. Magee testified that she was not aware of any problems with the PCGB cooler prior to plaintiff's accident on June 9, 2000. Ms. Magee was not made aware that the prior leak had occurred with the PCGB cooler because she had been assigned as an assistant manager to a section of the store other than where the leaking occurred.

---

**2.** The court notes that the uncontroverted facts indicate that safety sweeps are conducted at 10:00 a.m., 2:00 p.m., and 6:00 p.m. However, a review of the portions of Ms. Reidell's deposition cited in support of this evidence indicates that the last safety sweep is conducted at 7:00 p.m., rather than 6:00 p.m.

After plaintiff's fall, Wal–Mart store employees noticed water on the floor and thought the water came from an ice cream cooler. At Ms. Magee's direction the employees removed the ice cream cooler from the floor. Plaintiff testified during her deposition that she did not know the source of the water on the floor. Plaintiff now alleges the water came from a PCGB cooler located near the checkout line.

When Ms. Reidell was informed of the plaintiff's accident, she contacted PCGB and reported a reoccurrence of a leak from the PCGB cooler. Ms. Reidell testified that, "When I was informed of the accident I contacted Pepsi [PCGB], because I was upset that we had reported that incident and that we had had a reoccurrence, so I contacted Pepsi [PCGB] after the accident." Ms. Reidell further testified that she did not recall when she reported the reoccurrence of the leak to PCGB. Ms. Reidell did not call PCGB regarding this reoccurrence on June 9, 2000—the day of plaintiff's fall—because she was not at the Atchison store on that day. PCGB did not receive any notice of problems with the cooler on Friday, June 9, Saturday, June 10, or Sunday June 11, 2000. After making the call to PCGB, PCGB "sent somebody out and changed the machine out."

Paul Ward, the territorial sales manager for PCGB, indicated in an affidavit that Ms. Reidell contacted him on Monday, June 12, 2000 and requested that PCGB remove the cooler from the Atchison Wal–Mart store. Mr. Ward then filled out a work order and directed that the cooler be promptly removed. Ms. Reidell testified that the PCGB cooler was removed from the store on June 12, 2000.

## F. Subsequent Observations Regarding the Cooler

On or about June 15, 2000, PCGB employees observed that a bottle was wedged in the leased cooler so that it kept a self-closing sliding door open approximately one to two inches. PCGB employees also observed that the drip pan to the cooler was full. Based on observations made by PCGB employees between June 12 and 20, 2000, PCGB contends that a PCGB bottle became wedged in the back sliding door of the cooler leaving one of the doors about one to two inches open and that this opening permitted the continuous circulation of humid air into the cooler. The humid air, in turn, produced excessive condensation, which drained into the cooler's drip pan. Defendant PCGB further contends that this excessive moisture then exceeded the capacity of the drip pan, resulting in water overflowing onto the floor.

Randy Releford, the on-premises district manager for the St. Joseph distribution center for PCGB, indicated in an affidavit made on September 27, 2001, that PCGB employees took the PCGB cooler from the Atchison Wal–Mart store to a PCGB repair shop. PCGB found "nothing wrong" with the cooler and, without making any repairs or alterations, installed this same cooler in a grocery store where the cooler has operated without incident for approximately fourteen months as of the date of Mr. Releford's affidavit.

## G. Plaintiff's Claims

In her complaint, plaintiff alleges that her fall was the result of defendant PCGB and defendant Wal–Mart's negligence. Specifically, plaintiff alleges that "[w]hile in the check-out lane at said Wal–Mart store, Plaintiff stepped in water which was on the floor as a result of a cooler which had leaked, and Plaintiff slipped and fell injuring her knee." (Pl.'s Complaint at ¶ 5). Plaintiff further alleges with respect to defendant PCGB that "said cooler was owned by the Defendant Pepsi–Cola General Bottlers, Inc., who failed to maintain

the leaking cooler even after notice." (*Id.* at ¶ 6). Finally, plaintiff alleges that her injuries "were the result of Defendants' failure to exercise the requisite care and breach of duty owed to the Plaintiff." (*Id.* at ¶ 8).

### ● Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmov-ing party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

### ● Defendant PCGB's Motions to Strike

Defendant PCGB contends the court should strike plaintiff's Amended Response and defendant Wal–Mart's Memorandum in Opposition, both filed in opposition to defendant PCGB's pending Motion for Summary Judgment. Generally, defendant PCGB contends that both responses are improperly submitted under applicable rules of procedure and relevant law.

The court is unpersuaded by the arguments of defendant PCGB that it would be improper for the court to consider plaintiff's Amended Response and defendant Wal–Mart's Memorandum in Opposition when determining the merits of the pending summary judgment motion. Accordingly, defendant PCGB's motions to strike are denied.

● Defendant PCGB's Motion for Summary Judgment

Defendant PCGB asserts that it had no duty to plaintiff with respect to its leased cooler on the date of plaintiff's fall. Defendant PCGB contends that any duty owed to plaintiff as an invitee at defendant Wal–Mart's store is "triggered" only by notice. Defendant PCGB contends that the uncontroverted evidence establishes that it did not have notice of any problems with its leased cooler, and that it did not receive notice of plaintiff's fall until three days after its occurrence. Therefore, defendant PCGB asserts, because it did not receive notice and because the cooler remained in the care, custody and control of defendant Wal–Mart, defendant PCGB had no duty to plaintiff and therefore, it could not have breached that duty. Accordingly, defendant PCGB contends summary judgment is appropriate on the negligence claim asserted against it. The court agrees.

## A. Existence of Duty

A federal court sitting in diversity must apply the law of the forum state. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *McCurdy Group v. Am. Biomedical Group, Inc.,* 9 Fed. Appx. 822, 827 (10th Cir.2001). Here, the parties do not appear to dispute that Kansas law governs the claims raised in plaintiff's complaint.

To recover for negligence under Kansas state law, plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. *Honeycutt ex rel. Phillips v. City of Wichita,* 251 Kan. 451, 463, 836 P.2d 1128, 1136 (1992). Whether a duty exists is a question of law for the court to consider. *Id.* Under negligence law, where no duty exists, there may be no breach of that duty to support a plaintiff's negligence claim

against a defendant. *Id.* (citing *Hackler v. Unified Sch. Dist. No. 500,* 245 Kan. 295, 297, 777 P.2d 839, 841 (1989)).

It appears the Kansas courts have not specifically addressed in any reported decision, the scope of the duty owed to an invitee by a vendor who leases equipment to an occupant of premises, where the leased equipment allegedly causes injury to the occupant's invitee. In the absence of definitive direction from the highest court of the state of Kansas, the federal court must "predict the course that body would take if confronted with the issue." *Stauth v. Nat'l Union Fire Ins. Co.,* 236 F.3d 1260, 1267 (10th Cir.2001).

Generally under Kansas state law, the occupant of premises must use ordinary care to keep the premises in a reasonably safe condition, and must warn invitees of concealed dangers of which the proprietor knows or should know. *Kimes v. Unified Sch. Dist. No. 480,* 934 F.Supp. 1275, 1278 (D.Kan.1996) (citing *Lyon v. Hardee's Food Sys., Inc.,* 250 Kan. 43, 53, 824 P.2d 198, 204 (Kan.1992)). Before a defendant may be held liable for an injury resulting from a dangerous condition, however, the plaintiff generally must show that the defendant had actual knowledge of the condition, or that the condition had existed for such a length of time that in the exercise of ordinary care the defendant should have known of it. *Id.* (citing *Knowles v. Klase,* 204 Kan. 156, 157, 460 P.2d 444, 446 (1969)).

Significant to the court here, Kansas law specifies that "[i]n a premises liability case, in order to be liable, the party charged must have had control over the premises in question." *Rogers v. Omega Concrete Sys., Inc.,* 20 Kan.App.2d 1, 5, 883 P.2d 1204, 1208 (1994) (emphasis added). The "liability of an occupant of real estate for injures caused by a dangerous or defective condition of the premises de-

pends generally upon his control of the property." *Id.* Accordingly, "[i]t is obvious that, without control, the responsibility for the dangerous or hazardous condition cannot exist .... a party may not be held responsible for a condition which he or she did not cause and which he or she has no ability to remedy." *Id.; see also Gragg v. Wichita State Univ.,* 261 Kan. 1037, 1048–49, 934 P.2d 121, 130–31 (1997).

When considering Kansas state law regarding premises liability, the court finds that if presented with the issue of when a duty by an "absent vendor" to an invitee arises under the facts presented in this case as set out in the summary judgment papers, the Kansas courts would conclude, consistent with current premises liability precedent, that such a duty arises only when the vendor has notice of the alleged dangerous condition and has an opportunity to remedy that condition.

### B. Analysis

 Here, the court finds the facts, even when viewed in the light most favorable to plaintiff as the non-moving party, fail to establish that defendant PCGB owed a duty to plaintiff on the date of plaintiff's fall. The evidence presented shows defendant PCGB received only one notice of a problem with the cooler. This notice came in the "week before" the plaintiff's fall. It is uncontroverted, however, that defendant PCGB's employees came to the store and repaired the leak. The PCGB employee who worked on the leak indicated that "he had fixed the problem."

In addition, it is uncontroverted that between the date of this repair and the date of plaintiff's accident, PCGB did not receive further notice of problems with the leased cooler. The court notes that there is no evidence presented regarding the nature of the cooler's problem the week before the plaintiff's fall. Accordingly, there is no evidence that the nature of the

problem addressed by PCGB's driver was sufficient to put defendant PCGB on notice that the cooler might continue to leak. Accordingly, the record fails to establish that defendant PCGB was given notice of a dangerous condition, sufficient to give rise to a duty to plaintiff. It is plaintiff's burden to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. The court finds plaintiff has failed to meet her burden with respect to her negligence claim against defendant PCGB.

Based on the record before the court, even when drawing all reasonable inferences in favor of plaintiff, the court finds defendant PCGB owed no duty to plaintiff on the date of plaintiff's fall. Accordingly, the court finds defendant PCGB is entitled to judgment as a matter of law on plaintiff's negligence claim. Defendant's motion for summary judgment is granted.

### ● Order

IT IS THEREFORE ORDERED that defendant Pepsi–Cola General Bottlers' Motions to Strike (Docs. 62 and 63) are denied.

IT IS FURTHER ORDERED that defendant Pepsi–Cola Bottlers, Inc.'s Motion for Summary Judgment (Doc. 52) is granted.