NOT DESIGNATED FOR PUBLICATION

No. 121,438

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Protest of
ARCITERRA BP OLATHE KS, L.L.C.
for the Tax Years 2016 and 2017 in Johnson County, Kansas.

MEMORANDUM OPINION

Appeal from Board of Tax Appeals. Opinion filed April 2, 2021. Affirmed.

*Ryan L. Carpenter*, assistant county counselor, of Olathe, for appellant Board of Johnson County Commissioners.

*Linda Terrill*, of Property Tax Law Group, LLC, of Overland Park, for appellee Arciterra BP Olathe KS, L.L.C.

Before GARDNER, P.J., SCHROEDER, J., and WALKER, S.J.

PER CURIAM: Johnson County (County) appeals the tax appraisal of real estate owned by Arciterra BP Olathe KS, L.L.C. (Arciterra). In 2016, Johnson County valued Arciterra's property at $17,538,740. As a result, Arciterra's property tax increased from $295,800 in 2015 to $553,115 in 2016. The County valued the property and imposed property tax similarly in 2017. Arciterra appealed to the Board of Tax Appeals (BOTA) to determine the value of the property for ad valorem taxes for the 2016 and 2017 tax years. After an evidentiary hearing, BOTA substantially lowered the ad valorem taxes for both years.

The County appeals BOTA's decision, but we may not overturn an administrative-agency decision when it is supported by substantial evidence, even though there may be

1

evidence to the contrary. Arciterra presented appraisal evidence supporting its valuation, and BOTA found that evidence to be the best indicator of the property's value. We find that BOTA's decision was supported by substantial evidence and the County's other claims of error are unpersuasive or unpreserved.

*Factual and Procedural Background*

In 2005, Bass Pro Shops (Bass Pro) negotiated a 20-year, build-to-suit lease agreement with the then owners of the subject property. Under the lease, the landlord was responsible for property taxes, some insurance, parking lot maintenance, and administrative and management costs. The lease required Bass Pro to pay an annual rent of $600,000—or $4.58 per square foot—and any operating expenses. The lease also gave Bass Pro the option of buying the property for $10 at the termination of the lease period. In 2008, Arciterra bought the property for $1,900,000 subject to the 2005 lease from the previous owners.

Bass Pro built a retail structure on the subject property financed by sales tax and revenue (STAR) bonds from the City of Olathe in 2006. The building is 130,988 square feet of net rentable area, and the improvements to the property sit on approximately 16.44 acres. Bass Pro has occupied the building since its construction.

The lease produced a positive cash flow for Arciterra from 2008 to 2016. But in 2016, the County substantially raised Arciterra's property tax obligations when it doubled its valuation of the subject property. In 2016, the County valued the property at $17,538,740, so the property tax increased from $295,800 in 2015 to $553,115 in 2016. The County valued the property and imposed property tax similarly in 2017.

Arciterra appealed to the Board of Tax Appeals to determine the value of the subject property to impose ad valorem taxes for the 2016 and 2017 tax years.

2

*Evidentiary Hearing*

BOTA conducted an evidentiary hearing in December 2018. Testimony was presented from each party's corporate representatives and appraisers. Both parties agreed that the highest and best use of the subject property—if vacant—was use as another build-to-suit improvement, and—as improved—was as a build-to-suit, single tenant retail building. The County recommended the subject property be valued based on the highest appraisal—one by Timothy Keller, MIA. Keller valued the subject property at $14,475,260 for 2016 and $14,470,320 for 2017. Arciterra presented testimony from Gerald Maier, MIA, who valued the property as both a "hypothetical leased fee" estate and a "fee simple" estate. Arciterra asked BOTA to adopt the lowest appraisal—Maier's fee simple valuation of $7,500,000 for 2016 and $7,850,000 for 2017. BOTA accepted neither request, adopting Maier's "hypothetical leased fee" value instead.

*Keller's valuation approach*

The County originally commissioned Valbridge Property Advisors (Valbridge) to study big box retail stores to help it determine market value. But after Arciterra appealed to BOTA, the County commissioned Keller to perform an appraisal. As for market rent, Keller testified that he looked for "larger retail tenants" similar in size to Bass Pro and who had recently signed leases in the same market. Keller also considered the results of the Valbridge study. He acknowledged that several leases considered in the Valbridge study were build-to-suit leases. Likewise, Keller testified that at least two of the four leases he considered were build-to-suit leases. Keller considered these four properties: Price Chopper, Dick's-Field & Stream, Best Buy, and Oak Barry Shopping Center. Price Chopper and Oak Barry Shopping Center had build-to-suit leases; Best Buy originally had a build-to-suit lease but the lease was later renegotiated.

3

Both experts considered this court's decision in *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 275 P.3d 56 (2012). *Prieb* determined that because build-to-suit leases are essentially financing agreements, they should not be used in determining market rent absent certain adjustments. 47 Kan. App. 2d at 135-36.

"A commercial build-to-suit lease is essentially a financing agreement between a lessor and lessee, and the rental rates therein are based in large part upon the revenue needed to amortize the investment required for the contemplated construction—plus a measure of profit—over the lease term or extensions thereof. Accordingly, when one takes a snapshot view of rental rates at any time during such a lease, these rates are not reflective of market rent but rather just reflective of the rate required in that specific situation to continue an agreed revenue stream to amortize the lessor's investment, subject to a host of financial risks. In other words, contract rents in a build-to-suit lease are not designed to capture market value for each period within the lease term, but rather are designed to amortize an investment made at the outset and may vary dependent on factors that are unrelated to the real estate market thereafter." 47 Kan. App. 2d 122, Syl. ¶ 7.

Keller testified that it was okay to consider build-to-suit leases to determine market rent if the necessary adjustments were made. But Keller did not explain what adjustments he made to the build-to-suit leases or how those adjustments complied with *Prieb*. When asked what adjustments were necessary to allow use of a build-to-suit lease, Keller testified that the necessary adjustments could include adjustments to "the contributory value of that particular case" and other adjustments that appraisers typically make in the normal course of their appraising duties. And although Keller's appraisal report showed that he made adjustments for the properties' market condition, location, design, size, and age, Keller refused to explain how he made those adjustments at the hearing and instead directed opposing counsel to review his appraisal report.

Keller valued Arciterra's property using a $10 per square foot, triple net lease market rental rate, 7.25% capitalization rate, and 7.5% vacancy rate. Keller concluded

that the property's fair market value was $14,475,260 for 2016 and $14,470,320 for 2017. Keller testified that his valuation was based on the fee simple estate as required under Kansas law. He also maintained that he tried not to attribute any value to Arciterra's lease with Bass Pro. Keller's report stated that he valued the subject property's fee simple interest. Still, Keller testified that he did not believe that the fee simple standard announced in *Prieb* and other rulings from this court meant that the property had to be valued as if vacant on the date of the hypothetical sale. Consistent with that belief, Keller valued the property "as improved" instead of "as vacant" based on his determination that the property's highest and best use was the continued use of the property as a "Class A big box retailer."

Keller explained that he chose the highest and best use of the property "as improved" instead of "as vacant" because the property was unique and when valued was being used at its maximum capabilities:

"The existing improvements produce a significant positive cash flow, before debt, and this can reasonably be expected to continue.

"There are no alternative uses that could reasonably be expected to provide a higher present value than the current use. The value of the subject under the existing use exceeds the potential value associated with the alternatives. Furthermore, the value produced by the existing improvements exceeds the value of the site, as if vacant. For these reasons, the existing use as a Class A big box retailer is concluded to be maximally productive, and the highest and best use of the site as improved.

"The duration of occupancy for these types of facilities confirms their market acceptance. The subject's two-story design, while found in other properties in Johnson County, is not typical in this market."

*Maier's valuation approach*

Maier conducted cost, income, and sales comparison approaches, but he relied most significantly on the income approach. Besides valuing the property as a "fee simple" estate, Maier provided BOTA with a valuation of the property as a "hypothetical leased fee" estate. Under his hypothetical leased fee method, Maier assumed that the property would be encumbered by a short-term lease agreement with a moderate credit tenant. Maier explained that he started providing his clients with the hypothetical leased fee value because he was unsure what Kansas law required in valuing a property's fee simple interest when a property was occupied. In other words, Maier used his hypothetical leased fee method to value a property's fee simple interest while accounting for its current occupancy.

But Maier testified that he stopped routinely using this method after this court's decision in *In re Equalization Appeal of Target Corporation*, 55 Kan. App. 2d 234, 410 P.3d 939 (2017). He was concerned that his hypothetical leased fee value may not reflect the property's fee simple interest because it did not assume the occupant would vacate the property on the day of the hypothetical sale. Still, Maier provided that method as an option here because he believed it was necessary to show that Bass Pro's occupancy increased the subject property's value—Bass Pro did not intend to vacate the property. Thus, Maier's hypothetical leased fee value considered the fact that Bass Pro leased the property and would likely exercise its option to purchase the property for $10 in 2025.

In reaching his values, Maier compared nine real estate leases to determine market rent. Consistent with *Prieb*, he excluded first generation build-to-suit leases.

> "Consequently, we hold that rental rates contained in or reflected by commercial build-to-suit leases are not reflective of market conditions and may not be utilized for purposes of the income approach or the sales comparison approaches to value for ad

6

valorem tax purposes in Kansas without a disentanglement by adjustments that is beyond the scope of this appeal. See The Appraisal of Real Estate, p. 447." *Prieb*, 47 Kan. App. 2d at 135-36.

Maier determined that even comparable leases to first-generation tenants were not representative of market rents because they were typically negotiated before improvements were made to the property. As he testified in another case, first-generation leases are not to be used in an income approach because "[t]he tenant pays an above market rate for a turn-key lease that provides a prototype building allowing for economies of scale in the overall company. These tenants would not be willing to pay the same rate for space designed for another retailer's use." *Target*, 55 Kan. App. 2d at 240.

So Maier's comparable rental properties included those with leases to second-generation tenants in big box structures that were renovated for use by another retailer and leases to second-generation tenants that required minimal renovation. Maier adjusted his comparable leases for time, market conditions, lease terms, building size, age, condition, location, and construction quality.

Ultimately, Maier determined that under his fee simple method, the property's rental rate was $7 per square foot for 2016 and $7.25 for 2017, expense reimbursements were $1.96 per square foot for 2016 and $1.99 for 2017, vacancy rate and collection loss was 7.5%, expenses were $2.41 per square foot for 2016 and $2.44 for 2017, and the capitalization rate was 7.5%. Maier concluded that the subject property's fair market value was $7,500,000 in 2016 and $7,850,000 in 2017.

Maier applied those same fee simple values in his hypothetical leased fee method, except he increased the capitalization rate from 7.5% to 8.5%. Maier appraised the hypothetical leased fee value at $9,070,000 for 2016 and $9,410,000 for 2017.

*BOTA's Decision*

We find it helpful to summarize some foundational legal rulings BOTA made that the County does *not* allege were erroneous:

- the County had the burden of proof to show BOTA the correctness of its valuation;
- valuations for ad valorem tax purposes must be based on the fair market value of the owner's fee simple interest in the real property;
- the subject property was best valued using an income approach;
- the highest and best use of the subject property was its existing use or one similar to it;
- when determining economic rent, an appraiser must use market rent rather than contract rent when valuing income producing properties; and
- valuation may account for the property's earning capacity as shown by lease price.

Citing *Prieb*, BOTA found that build-to-suit leases do not reflect market rent and should thus not be used to determine market rent unless an appraiser makes the necessary adjustments.

BOTA rejected Keller's valuation because he used build-to-suit leases in determining market rent. And although BOTA acknowledged that Keller adjusted his "rent comparables for market conditions, design, size, age, and location/access," Keller had not shown that those adjustments complied with *Prieb*'s disentanglement standard. As a result, BOTA found that Keller's appraisal provided "limited probative value." And Keller's appraisal was the only one the County relied on.

BOTA adopted Maier's "hypothetical leased fee" valuation, finding it was better supported by the evidence. The nine leases Maier considered were from Johnson County and were of comparable age and size to the subject property, and he had made appropriate adjustments to comparable leases and did not use build-to-suit leases.

The County appeals.

*We Have Jurisdiction*

Arciterra argues that this court lacks jurisdiction to consider any of the County's claims and asks us to reconsider its motion to involuntarily dismiss the County's appeal. Whether jurisdiction exists is a question of law over which this court has unlimited review. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017).

This jurisdictional question requires us to review some procedural rulings. Although BOTA had ruled in Arciterra's favor by significantly reducing the amount of ad valorem taxes due, Arciterra moved for reconsideration, asking BOTA to explain that the "hypothetical leased fee" valuation it accepted was essentially the fee simple interest that Kansas law requires. But before BOTA ruled on Arciterra's motion, the County petitioned for judicial review in this court. Arciterra then moved our court to involuntarily dismiss the County's appeal, arguing the County's petition for review had been filed prematurely. But after BOTA summarily denied Arciterra's motion for reconsideration, our motions panel denied Arciterra's motion to dismiss the appeal.

We find no merit to Arciterra's claim that we lack jurisdiction. As we detail below, a final judgment generally validates a premature notice of appeal, and Arciterra did not argue to BOTA and does not show us that the County's premature filing prejudiced it.

In *Honeycutt v. City of Wichita*, 251 Kan. 451, 836 P.2d 1128 (1992), our Supreme Court held that a final judgment generally validates a premature notice of appeal:

> "We hold that if a judgment is entered disposing of all claims against one of multiple parties, and a premature notice of appeal is filed and has not been dismissed, then a final judgment disposing of all claims and all parties validates the premature notice of appeal concerning the matters from which the appellant appealed. The appellee will not be prejudiced because the appellee will know of the intent to appeal prior to final judgment and would be in the same position as if a notice of appeal had been filed after the final judgment." 251 Kan. at 462.

Similarly, in *Cornett v. Roth*, 233 Kan. 936, 666 P.2d 1182 (1983), our Supreme Court emphasized the need for the party asserting a lack of appellate jurisdiction to show prejudice, allowing a party to file a notice of appeal even though a motion to reconsider was pending in BOTA:

> "Defendants have shown no prejudice resulting from the alleged premature filing of the notice of appeal. Considering the liberal construction to be given our procedural statutes and rules and the intent of our code of civil procedure and our appellate rules, we find no fatal jurisdictional defects and will proceed to determine the appeal on the merits. See K.S.A. 60-102; Supreme Court Rule 203." 233 Kan. at 939-40.

We do the same. Because BOTA's final judgment validated the County's premature notice of appeal and Arciterra has not shown prejudice, we have jurisdiction over the County's appeal.

*The County Fails to Show That BOTA Committed Reversible Error*

As for the merits of the County's appeal, the County asserts that BOTA's decision stemmed from errors of law or fact, was otherwise arbitrary, capricious, or unreasonable, and was not supported by substantial evidence. The County also asserts that BOTA erred

10

by accepting Maier's "hypothetical leased fee" method of valuing the property because that method is "unconstitutional." But before we examine the merits of these arguments, we must address yet another procedural hurdle—Arciterra's argument that the County failed to preserve these issues. As detailed below, we agree that the County's constitutional argument is unpreserved.

*The County fails to preserve some issues.*

Arciterra argues that because the County failed to file closing arguments or a motion for reconsideration before requesting judicial review in this court, we should find that the County failed to preserve the issues it raises on appeal.

We disagree with Arciterra's argument that the County's failure to move for reconsideration creates a bar in this court. A party is no longer required to file a motion for reconsideration before it seeks judicial review of BOTA's final order. See K.S.A. 74-2426(c)(4)(A).

As to the County's failure to file closing arguments, a summary of procedural rulings is in order. BOTA gave both parties 30 days after the transcripts of the hearing were completed to file written closing arguments. Arciterra's closing arguments asserted that the County had failed to provide BOTA with a valuation that followed Kansas law and asked BOTA to adopt Maier's fee simple valuation. BOTA made its decision without considering any closing argument from the County and now states it never received them.

A little more background is necessary. The County requested BOTA to certify a limited record for appeal, but that record did not include either of Keller's appraisal reports or the County's closing arguments which the County alleged it had timely filed with BOTA. So the County moved to add those three documents to the record on appeal, attaching a copy of its closing arguments and an email seemingly showing that it had

11

properly requested that the arguments be filed with BOTA. The County's closing arguments state that Maier's valuation failed to assess the fair market value of the property's fee simple interest, was not based on the property's highest and best use, and otherwise failed to meet Uniform Standards of Professional Appraisal Practice (USPAP).

Our motions panel then granted the County's request for additions to our record for all three documents. But BOTA responded by letter to our court stating it could not certify the County's closing arguments because it had never received them. As a result, BOTA provided certified copies of Keller's appraisal reports but not of the County's closing arguments. These facts underlie Arciterra's argument that because the County failed to file closing arguments before requesting judicial review in this court, it failed to preserve any issue it raises on appeal.

Arciterra is correct that generally, a party must first give BOTA a chance to resolve the arguments made on appeal to meet our preservation rule. See *Wolfe Electric, Inc. v. Duckworth,* 293 Kan. 375, 403, 266 P.3d 516 (2011); *In re Equalization Appeal of ARC Sweet Life Rosehill*, No. 113,692, 2016 WL 3856666, at *6 (Kan. App. 2016) (unpublished opinion). And although exceptions to the preservation rule exist, the County does not argue an exception here. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008).

Instead, the County tries to explain why these issues are properly before this court even though they were not raised to BOTA. See Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34). It contends that its failure to file its closing arguments with BOTA was inadvertent and that its closing arguments raised the same issues before BOTA that it raises on appeal. We decline to write an equitable exception into our preservation rule based on those events. Nonetheless, we reach the merits of the County's general claim that BOTA erroneously valued the property because that was the primary issue litigated to BOTA and a party need not object at the BOTA level to preserve a

12

sufficiency of evidence argument for appeal. See *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008).

We will not, however, reach the County's new constitutional claim—that BOTA erred by accepting Maier's "hypothetical leased fee" value because that method is unconstitutional. The County fails to show us that it presented and argued this issue to BOTA. And we find no constitutional claim in the County's closing arguments. Its failure deprived BOTA of the opportunity to address the issue in the context of this case and such an analysis would have benefitted our review. Although the decision to review an unpreserved claim under an exception is a prudential one, *State v. Gray*, 311 Kan. 164, Syl. ¶ 1, 459 P.3d 165 (2020), the County argues no exception here. We therefore decline to address the County's unpreserved constitutional argument.

*Basic Legal Principles*

We review BOTA's decisions as directed by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. See K.S.A. 74-2426(a), (c); K.S.A. 77-603(a). Under the relevant statute, we may grant relief if the appellant shows that BOTA's decision was based on errors of law and fact, was otherwise arbitrary, capricious, or unreasonable, or was not supported by substantial evidence. K.S.A. 77-621(c). So we examine the merits of the County's claim that BOTA's decision stemmed from errors of law and fact, was otherwise arbitrary, capricious, or unreasonable, and was not supported by substantial evidence.

We begin by reviewing some general legal principles. The test for finding arbitrary and capricious conduct depends on the reasonableness of and foundation for the action. An order is arbitrary and capricious if it is unreasonable or without foundation in fact. See *In re Equalization Appeal of Tallgrass Prairie Holdings*, 50 Kan. App. 2d 635, 659-60, 333 P.3d 899 (2014). So whether BOTA acted unreasonably, arbitrarily, or

capriciously depends on the quality of its reasoning. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010).

To the extent this issue involves interpretation of a statute, our review is unlimited. *In re Tax Appeal of BHCMC*, 307 Kan. 154, 161, 408 P.3d 103 (2017). Otherwise, we review factual findings to determine whether they are supported by substantial evidence in light of the record as a whole. K.S.A. 77-621(c)(7); *Sierra Club v. Moser*, 298 Kan. 22, 62-63, 310 P.3d 360 (2013). In making this determination, we must review evidence that supports and detracts from BOTA's findings. K.S.A. 77-621(d). "Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion." *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 916, 157 P.3d 1109 (2007). In reviewing the evidence, we are not to reweigh or engage in de novo review of the evidence. K.S.A. 77-621(d); *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

We strictly construe tax provisions in favor of the taxpayer. See *In re Tax Exemption Application of Central Illinois Public Services Co.*, 276 Kan. 612, 616, 78 P.3d 419 (2003). When considering whether BOTA's decision is supported by substantial competent evidence, we will reverse only if we find that the decision was "so wide of the mark as to be outside the realm of fair debate." *Prieb*, 47 Kan. App. 2d at 137.

The subject property is real property primarily used for commercial purposes; thus, the County had the burden of production and persuasion before BOTA to show the correctness of its valuation. K.S.A. 79-1609. Likewise, the County, as the party challenging the validity of BOTA's action on appeal, bears "[t]he burden of proving the invalidity of agency action." K.S.A. 77-621(a)(1). And even when we find that BOTA erred, we do not reverse if that error was harmless. K.S.A. 77-621(e); *Sierra Club*, 298 Kan. at 47; *In re Equalization Appeal of Kansas Star Casino*, No. 116,782, 2018 WL 3486173, at *10 (Kan. App. 2018) (unpublished opinion).

When valuing property for ad valorem tax purposes, Kansas law requires that the valuation be based on a "fee simple interest, not the leased fee estate." *Prieb*, 47 Kan. App. 2d at 132.

> "Fee simple interest is defined as absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. Stated another way, ownership of the fee simple interest is equivalent to ownership of the complete bundle of property rights that can be privately owned. This interest is in contrast to a leased fee interest defined as the ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." 47 Kan. App. 2d 122, Syl. ¶ 5.

Although Kansas tax statutes do not refer to the term, fee simple interest, "it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal." 47 Kan. App. 2d at 130 (citing K.S.A. 79-501 and K.S.A. 79-503a). The fee simple interest of real estate consists of tangible property, excluding intangible property interests. See K.S.A. 79-102; see also *In re Tax Protest of Strayer*, 239 Kan. 136, 142, 716 P.2d 588 (1986).

In determining the ad valorem valuation, Kansas law assumes the hypothetical condition of an assumed sale as of January 1 of the applicable tax year. K.S.A. 79-1455 requires that "[e]ach year all taxable and exempt real and tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a." K.S.A. 79-503a defines "[f]air market value" as the amount of money that

> "a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real

15

property which is subject to any special assessment, such value shall not be determined by adding the present value of the special assessment to the sales price."

Valuations must be performed in accordance with USPAP. See K.S.A. 79-505; *In re Equalization Appeal of Johnson County Appraiser*, 47 Kan. App. 2d 1074, Syl. ¶ 9, 283 P.3d 823 (2012). "These standards are embodied in the statutory scheme of valuation, and a failure by BOTA to adhere to them may constitute a deviation from a prescribed procedure or an error of law." *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, 735, 88 P.3d 242 (2004).

*The County failed to make a prima facie case to BOTA.*

This brings us to the first substantive issue on appeal. The parties agree that the County had the burden to present evidence to BOTA showing the correctness of its valuation. K.S.A. 79-1609. But the parties disagree whether the County met that burden.

We agree that the County failed to meet its burden of production and persuasion before BOTA. True, as the County argues, BOTA did not state that the County had failed to meet that burden. But BOTA rejected Keller's valuation because he used build-to-suit leases in determining market rent. Although BOTA acknowledged that Keller adjusted his "rent comparables for market conditions, design, size, age, and location/access," Keller failed to persuade BOTA that those adjustments complied with *Prieb*'s disentanglement standard. As a result, BOTA held that Keller's appraisal provided "limited probative value." Because Keller's appraisal was the only one the County relied on, the County failed to make a prima facie showing that its appraisal was correct. Nonetheless, we consider below all the evidence presented to BOTA.

16

*The validity of* Prieb

Underlying most of the County's arguments on appeal is its unwillingness to follow *Prieb*. Although the County invites us to depart from *Prieb*, its brief gives us only conclusory reasons to do so. It asserts in a sole paragraph that *Prieb* misrepresents prior BOTA cases, relies on cases that do not support that proposition or have been overturned, relies on articles whose sources are not authoritative, cites an incorrect statute to define real property for tax purposes, relies on the testimony of a witness in another jurisdiction to prove the truth of the matter, fails to cite *Board of Johnson County Comm'rs v. Greenhaw*, 241 Kan. 119, 734 P.2d 1125 (1987) (a Kansas case) or *Board of Douglas County Comm'rs v. Cashatt*, 23 Kan. App. 2d 532, 933 P.2d 167 (1997) (another Kansas case) or any law related to ad valorem valuations, disregards credibility determinations of BOTA, and misrepresents The Appraisal of Real Estate (a treatise) as rejecting build-to-suit leases. But those assertions are made in only one conclusory paragraph, lack citation to the record or to other authority, and are undeveloped. The County does not share with us, for example, what cases *Prieb* relied on that have been overturned, or what articles *Prieb* cited whose sources are not authoritative. So although there may be good fodder at some point for reexamining *Prieb*'s conclusion, the County's arguments are undeveloped and provide no basis for us to do so here. So despite the County's dislike for *Prieb*, we apply its rulings here.

*Kansas law requires valuation of the fee simple interest.*

The County dislikes *Prieb*'s definition of "fee simple interest" and urges us to instead apply the definition of that term from Black's Law Dictionary. But we find it unnecessary to parse any linguistic differences between the two because the County does not show us how the *Prieb* definition is wrong, how the *Prieb* definition substantially differs from Black's definition, or how use of Black's definition would make a difference in BOTA's decision.

And any difference in the definitions of "fee simple" is a moot point since the County argues that it need not value real property in fee simple—*Prieb* got that wrong too. The County argues that the statutes governing real property valuations do not use the term "fee simple" or require a "fee simple" valuation, citing K.S.A. 79-102, 75-503a, and 79-411.

But the County overlooks our caselaw holding that our statutes require valuation of the fee simple interest. When valuing property for tax purposes, Kansas law requires valuation of the fee simple interest, which is defined as "'[a]bsolute ownership unencumbered by another interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008)." *Prieb*, 47 Kan. App. 2d at 130.

> "Kansas tax statutes do not use the term 'fee simple'; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple. . . . K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value." 47 Kan. App. 2d at 130.

We find no reason to depart from this rule here; thus, BOTA did not err in requiring the appraisals to be based on the property's fee simple interest.

*Maier's "hypothetical leased fee" vs. his "fee simple" valuations*

We take a detour to note that this is not at issue on appeal—that is whether Maier's "fee simple" method or Maier's "hypothetical leased fee" method is most accurate.

Kansas property tax is premised on the fair market value of the fee simple interest of real estate. Yet BOTA adopted Maier's valuation for the 2016 and 2017 tax years based on what Maier defined as the "hypothetical leased fee" interest, instead of what

Maier separately designated the "fee simple" interest. Arciterra moved BOTA to reconsider that decision, but BOTA summarily denied that motion.

At the hearing, Maier distinguished his hypothetical leased fee method from the fee simple estate. He testified that his "fee simple" method valued the fee simple estate and his "hypothetical leased fee" method valued the property assuming it was encumbered by a two- to three-year lease to a moderate creditor. Likewise, Maier's report calculated his "fee simple" values separate from his "hypothetical leased fee" values. In his appraisal report, Maier explained that because many appraisers recognize inherent value in the fact that a building is occupied, he provides some clients a property value as a hypothetical leased fee estate. Under this approach, Maier assumes that a property is encumbered by "a contract . . . under which the owner [of the property] is paid rent." In other words, Maier assumed a lease was in place and added value accordingly.

But the County fails to show that BOTA's use of Maier's hypothetical leased fee valuation violates Kansas law or USPAP standards. On appeal, the County does not argue that BOTA should have adopted Maier's "fee simple" method—after all, that method would lower the ad valorem tax even more, and the County asserts that *Prieb*'s fee simple requirement is wrong. Nor does Arciterra make that argument. Instead, Arciterra argues that BOTA appropriately valued the fee simple interest by using the hypothetical leased fee interest, echoing the very argument the County made in another case. See *Target*, 55 Kan. App. 2d at 239 (the County "assert[ed] Maier's hypothetical leased fee value was actually a fee simple value" that complied with USPAP standards). And the County argues that Keller properly considered the actual lease on the property. So the issue, as presented to us, is not whether Maier's "fee simple" method or Maier's "hypothetical leased fee" method is most accurate. Instead, the issue briefed is whether BOTA erred by not using Keller's valuation.

19

*Keller improperly relied on build-to-suit leases.*

BOTA determined that Maier's valuation was a better indication of the subject property's fair market value than Keller's valuation. This was largely because Keller, in his income approach, relied on some build-to-suit leases to determine market rent. But *Prieb* determined that build-to-suit leases should not be used in determining market rent unless certain adjustments are made. See *Prieb*, 47 Kan. App. 2d at 135-36. And Keller never explained what adjustments he made when considering the build-to-suit leases. Keller thus failed to show that he sufficiently adjusted the leases to reflect market rent, as *Prieb* requires. See 47 Kan. App. 2d at 135-36. So BOTA properly rejected Keller's valuation based on his use of build-to-suit leases to determine market rent.

The County disagrees with *Prieb*'s finding that build-to-suit leases are essentially financing agreements, asserting that such leases are nothing more than operating leases to occupy real property so there is nothing to disentangle. It also asserts that it is BOTA's duty to determine what, if anything, needs disentangling. But it has not persuaded us that *Prieb* erred in this respect.

*Maier properly excluded build-to-suit leases.*

In contrast to Keller's use of build-to-suit leases, Maier appropriately found that the first-generation build-to-suit leases were likely not representative of market value so he excluded them from his analysis. Maier was not legally required—as the County suggests—to consider build-to-suit leases or the existing lease to determine the property's fair market value and market rent. Instead, Maier's decision not to use first-generation build-to-suit leases reflects this court's ruling in *Prieb*.

BOTA also found that Maier's market rent determination was sufficiently supported by comparable leases that reflected market rent. Maier's appraisal included a

20

detailed analysis of the cost, sales, and income approaches to valuing real property. This analysis complied with K.S.A. 79-503a. And Maier's determination of market rent was based on a comparison of nine leases, including those to second-generation tenants in big box structures that were renovated for use by another retailer and leases to second-generation tenants that required minimal renovation. Those leases account for the subject property's value as occupied. Second-generation as-is leases are most indicative of market rent, as the cost of owner-financed renovations are amortized over the term of the lease. See *Target*, 55 Kan. App. 2d at 240. Finally, Maier made appropriate adjustments for time, market conditions, lease terms, building size, age, condition, location, and construction quality. So his appraisal was appropriate and complied with Kansas law. See 55 Kan. App. 2d at 239-40.

*Valuations must be based on market rent, not contract rent.*

As our cases explain, when valuing a property under the income approach, the fee simple interest in property must be valued based on an estimate of market rent, not contract rent. See *Prieb*, 47 Kan. App. 2d at 131-32. This is because value attributable to a contract right is not appropriately added to the value of the fee simple estate. See K.S.A. 79-102; *Strayer*, 239 Kan. at 142. Still, the market rent determination should consider the value that leases may contribute. So we determine market rent by considering the terms of a lease that a hypothetical buyer and seller could freely negotiate in an arm's length transaction. See *Southlake Indiana LLC v. Lake County Assessor*, 135 N.E.3d 692, 697-98 (Ind. T.C. 2019), *transfer denied* 143 N.E.3d 961 (2020) (citing The Appraisal of Real Estate, 447, 466 [14th ed. 2013]).

Market rent is not, however, necessarily accurately reflected by the particular lease that encumbers the property being valued. This is particularly so when the lease is a build-to-suit lease, as here, or is otherwise unique. The lease here was unusual, giving the tenant the option of buying the big box commercial property for $10 at the end of a 20-

21

year lease. The County correctly notes, however, that Kansas law does not hold that build-to-suit leases may never be considered in determining market rent. If, for example, an appraiser can show that a build-to-suit lease was motivated by market terms and can isolate above- or below-market rents to make the necessary adjustments, BOTA could find that a market rent determination is properly supported and based on appropriate, comparable leases. See, e.g., *Southlake Indiana LLC*, 135 N.E.3d at 697-98. But the County failed to show that Keller made any such adjustments, as *Prieb* requires, despite his reliance on build-to-suit leases.

*Valuations must be of the "as vacant value" of occupied property.*

BOTA adopted Maier's "hypothetical leased fee" value based on its finding that the subject property "was leased . . . and [was] not subject to a holding period" when it was valued. It found Maier's "hypothetical leased fee" value to be "essentially the valuation method used by the County assuming a typical lease, typical vacancy, typical expenses." Although BOTA did not have to assume that the subject property was not leased—that would be an inaccurate description of the property—it had to value the property "as vacant" on the date of the hypothetical sale. See *Prieb*, 47 Kan. App. 2d at 132 (requiring value "'as if the property were vacant and available to be leased at market rent'" on the date of the hypothetical sale).

Maier's hypothetical leased fee value did not attribute value to the actual lease in place. Instead, it attributed value to a hypothetical lease. This complied with *Prieb*'s requirement that the appraisal reflect market rents instead of contract rents. See *Prieb*, 47 Kan. App. 2d at 130 (citing K.S.A. 79-501 and K.S.A. 79-503a). The hypothetical lease Maier considered was a short-term, two- to three-year lease. Maier chose the short term based on his attempt to add value to the property similar to the value that the encumbering lease provided. The County does not argue that Maier failed to value the property as if the terms of the lease were freely negotiated based on market terms. See

22

*Southlake Indiana LLC*, 135 N.E.3d at 697-98 (citing The Appraisal of Real Estate, 447, 466 [14th ed. 2013]) (valuations for tax purposes must be based on an estimate of market rent for a lease that was freely negotiated); see also K.S.A. 79-503a (defining "fair market value" as an amount well informed parties can accept in a competitive market); *Prieb*, 47 Kan. App. 2d at 130 (same). Assuming Maier's market rent analysis produced an appropriate value, his consideration of a hypothetical lease to another tenant that might occupy the property after the hypothetical sale does not render Maier's hypothetical leased fee values legally invalid.

*Maier valued the property at its highest and best use.*

Although both parties agree that the highest and best use of the property is build-to-suit, or the continued use as a big-box retail store, the County argues that Maier's hypothetical leased fee valuation failed to value the property at its highest and best use. This argument is threefold. First, the County argues that no hypothetical may be used because neither K.S.A. 79-102, which defines real property, nor K.S.A. 79-503a, which provides a nonexclusive list of factors that may be used to determine fair market value, includes a hypothetical condition.

We are unpersuaded. Nothing in either of those statutes precludes the use of a hypothetical lease. And we do not presume that a hypothetical condition may not be used in valuation merely because it was not included in the list. See *State v. Martin*, 285 Kan. 735, 741-42, 175 P.3d 832 (2008). K.S.A. 79-503a's list is nonexclusive, and one would not expect either that list or a definition of real property to include every factor that may properly be considered. The County has not shown that Maier violated Kansas statutes or USPAP, or how his use of the hypothetical condition was in error.

Second, although the County agrees that valuation must use market rents, it argues that Maier failed to use market rents because he used multi-tenant lease rates instead of

23

build-to-suit leases as comparables. But Maier's comparables complied with *Prieb*'s prohibition on using first generation build-to-suit leases as well as its prohibition on using contract rents.

Third, and more generally, the County builds an argument on our statutory definition of real property for ad valorem valuation. That definition states that real property includes "not only the land itself, but all buildings, fixtures, improvements, . . . rights and privileges appertaining thereto." K.S.A. 79-102. The County contends that a leasehold is a "right" pertaining to real property so the value of a leasehold must be included in the unitary valuation. And because unitary valuation considers earning capacity as indicated by lease price and reasonable rental value, no loss happens by not separately assessing the leasehold interest of the lessee. So, it contends, there is nothing to disentangle from build-to-suit leases. But the County cites no authority supporting its assertion that a lease is a right relating to real property, and this argument is merely another way of asserting that fee simple is not required, contrary to *Prieb* and other cases.

The County also alleges that Maier erred in valuing the property's highest and best use "as vacant" instead of "as improved." But K.S.A. 79-503a requires property to be valued as it physically exists at the time, and Maier's appraisal did that. And as this court has explained, real property must be valued as vacant to separate the value of the property from the value of the business being conducted on the property. So BOTA was required to determine "the value of the property itself if [Bass Pro] vacated it so another tenant could move in." *Target*, 55 Kan. App. 2d at 242. Determining the "as vacant value" of the occupied, subject property differs from valuing the property as "a vacant property"—i.e., one that was vacant when valued. The County cites K.S.A. 79-503a(g), which provides that "earning capacity as indicated by lease price" is one factor that may be used to determine fair market value. But as this court has already explained, it is "permissible to 'determine the difference between the value of the property under a hypothetical vacant condition and its value as occupied in order to isolate the value of the taxable real estate

24

separate and apart from the business being conducted on it.' 2016 WL 3856666, at *15."
55 Kan. App. 2d at 244. So we have never held that an appraisal of real property must exclude the value that a lease brings to a landowner.

*Remaining Claims*

Although the County mentions other issues, they are undeveloped by arguments or are unsupported by citation to pertinent authority. We thus do not reach their merits. A point raised incidentally or without supporting authority is improperly briefed and that issue is abandoned. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (points raised incidentally); *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) (unsupported points).

*Conclusion*

BOTA heard two full days of testimony consisting of a battle of the experts who asserted multiple methods of valuation, producing a lengthy transcript. There may be legitimate questions about some of the assumptions that underlie the final appraised value, but they are not briefed here. The County has shown nothing that undermines Maier's appraisal so much that a reasonable person could no longer accept its conclusion. BOTA properly relied on that appraisal to find that the property was worth $9,070,000 for 2016 and $9,410,000 for 2017. The County has failed to show that BOTA's decision was based on an error of law or fact, was otherwise arbitrary, capricious, or unreasonable, or lacked support by substantial evidence. In other words, the County has failed to meet its burden, both here and to BOTA, of proving the invalidity of agency action. See K.S.A. 77-621(a)(1).

Affirmed.